FLORENCE LaCROSSE v. CEDAR LAKE ICE COMPANY AND ANOTHER.[1]

June 17, 1938.

No. 31,729.

*Reynolds & McLeod,* for relators.
*J. Frank Boyles,* for respondent.

JULIUS J. OLSON, JUSTICE.
*Certiorari* on relation of employer and its insurer brings for re-

[1]Reported in 280 N. W. 285.

view the findings and order of the industrial commission (affirming like findings and order made by one of its referees) awarding compensation to petitioner as the surviving and dependent wife of one Roy LaCrosse, deceased employe. The challenged finding is that on "said date [July 11, 1936] said employe suffered an accident arising out of and in the course of said employment resulting fatally on July 12, 1936." Relators urge reversal on the alleged ground that "the evidence does not support or warrant" the quoted finding.

The facts may be thus summarized: The employe over a period of years had been working for Cedar Lake Ice Company. He was a young man, 38 years of age, robust and capable, a dependable and energetic worker. During the first half of July, 1936, there was an extreme heat wave in this locality. The place where he was required to work was much hotter than the registered temperature generally prevailing. During the week ending July 4, 1936, he had worked 76 hours; the next week, that ending July 11, 94 hours. On July 10 he worked all day up to midnight. He was called out again at one o'clock the next morning and worked until about 3:30 in the afternoon except that he was home and partook of breakfast at about four o'clock that morning. His work consisted of icing refrigerator and Pullman cars in the railroad yards of Minneapolis. Several witnesses estimated the temperature to be 20 degrees warmer between the railroad cars where he was working than out in the open. During that week and on several days preceding, the temperature rose above 100 degrees. On Friday and Saturday, July 10 and 11, the temperature rose to 106 degrees, the mean during these two days being 94 degrees.

About 9:30 o'clock in the forenoon of July 11 he was taken ill while on the job and asked to be relieved. He was requested to continue on the job and did so. About noon he again asked to be relieved claiming he was not well, that he felt sick, but was told to keep on. About three o'clock he again complained to one of his fellow employes and proceeded to call up his employer asking for a relief worker to take his place. Shortly thereafter he quit work and sat down between two boxcars on the railroad tracks. He

seemed to be ill. Another man then came to relieve him. He reached his home about four o'clock. Upon arriving there he sat in the kitchen resting his head in his hands with his elbows on the table. His face was flushed. He appeared to be "all in." His wife prepared a bath for him and he was put to bed. She sought to alleviate his suffering by applying cold towels to his head until about nine o'clock, and from then until midnight placed ice packs on his head. He became delirious at times but finally about midnight dozed off to sleep. The following morning, July 12, he arose at about eight o'clock. He attempted to read the Sunday paper but was restless, nervous, and did not appear normal. About one o'clock he ate his noonday meal, said he was feeling better, and that he was going to a show nearby. He met one of his fellow employes, to whom he communicated the information that he was not working because he was not feeling well. Between three and four o'clock he was brought home in a cab. Upon getting out of it he staggered, his feet did not seem to be able to carry him. He sat down in the living room a few minutes and then stretched out on the floor, a custom of his when the weather was hot. His wife testified that he appeared rational at times and at other times talked incoherently. Between 9:30 and 10:00 o'clock that evening he passed away while apparently asleep; at any rate his wife thought he was resting. An autopsy was had. The coroner in his death certificate stated the primary cause of death was "heatstroke"; the secondary cause was left blank. The post-mortem findings were, generally, normal except for the presence of tiny hemorrhages scattered through the cerebrum and over the epicardial surface.

The medical testimony for petitioner is to the effect that "taking into consideration the history leading up to this [final collapse], there isn't anything that I would say would be the probable cause of death except heatstroke. * * * If you mean the onset of the symptoms, it was when he first complained, and it is fair to suppose he had these symptoms sometime before he did complain. * * * From the history the inception of it was the morning he complained he couldn't work any longer accompanied by the symptoms of vom-

iting and weakness." Vomiting is considered a symptom associated with loss of body salts. Mental confusion, delirium, and pallor were also considered by petitioner's medical experts as indicative of a heatstroke. They were of opinion that the "collapse" on Sunday evening was due to "continuation of the insult that had been given to that body on Saturday and Friday and for many days previous."

Further discussion of the evidence is not deemed necessary. We think enough has been related to indicate that the triers of fact were not far afield in reaching the mentioned conclusion.

But counsel for relators say:

"In discussing the instant case in the light of the admitted facts, one of the first things that appeals to us is the question of whether or not the end result or the collapse in this case was induced and brought about solely through the agency of causation applied while LaCrosse was at work, or was there an independent, intervening cause unrelated to the employment?" And, so the argument proceeds, viewing the medical testimony as a whole, one is led to the inescapable conclusion that death was caused by the cumulative effect of the heat during the time the employe worked as well as the heat admittedly existing on the day of his death; that "there is no way from the history or [post-mortem] findings that a person can put his finger on a particular moment and say at that time it occurred."

We think the facts recited justified the triers thereof in finding that the agency of causation came into play during the time of employment and because thereof; that the ultimate collapse later following was directly and immediately traceable thereto. It cannot be said as a matter of law that there was an independent, unrelated, or intervening cause interrupting or displacing the cause set in motion during and because of the employment. "It matters not that the 'collapse' did not occur during the hours of the victim's employment or on the working premises." Ueltschi v. Certified Ice & Fuel Co. 201 Minn. 302, 304, 276 N. W. 220, 221.

150

The "onset of the symptoms" was when LaCrosse "first complained, and it is fair to suppose he had these symptoms sometime before he did complain." The time to which the doctor referred was Saturday, July 11, when the workman was seized with pain and compelled to vomit. Here, as in the cited case [201 Minn. 304], "the agency of causation was applied during the employment." The important thing to determine is not when the collapse occurred, nor whether it occurred upon the working premises of his employer, but rather when was the active, the proximate, cause set in motion causing the collapse. The cause having been found upon adequate proof, the result reached by the commission logically and necessarily followed.

Our latest case on heatstroke is Ruud v. Minneapolis St. Ry. Co. 202 Minn. 480, 279 N. W. 224. Many cases are there cited and appropriate comments made. Further discussion of the cases seems needless. The award is affirmed with an allowance to respondent of $100 as attorney's fees to be taxed with her statutory costs and disbursements.

So ordered.